# Richmond

## Equitable Fire and Marine Insurance Company, a Rhode Island Corporation v. Commonwealth of Virginia, at the Relation of State Corporation Commission.

March 15, 1954.

Record No. 4179.

Present, All the Justices.

The opinion states the case.

*Denny, Valentine & Davenport, Collins Denny, Jr.* and *Claude D. Minor*, for the appellant.

*J. Lindsay Almond, Jr., Attorney General, Francis C. Lee, Assistant Attorney General* and *Frederick T. Gray, Assistant Attorney General*, for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

This is an appeal from an order of the State Corporation Commission requiring appellant, Equitable Fire and Marine Insurance Company, a Rhode Island corporation, to deposit with the Treasurer of Virginia an additional $90,000 in bonds, or to enter into a surety bond in that sum, else its license to transact an insurance business in this State, as well as the license of its agents, would be revoked. Equitable complied with the order under protest and now appeals as of right therefrom. Code § 12-63; Constitution of Virginia § 156(f).

The Commission's order was entered pursuant to the provisions of § 38.1-87[1] of the Code because the Commis-

---

[1] "§ 38.1-87. Retaliatory provisions as to taxes, fees, deposits and other requirements.—If by the laws of any other state or subdivision thereof any insurance company of this State, or the authorized agents thereof, are required to make any deposit of securities in such other state for the protection of policyholders or for any other purpose, or are required to make payment for taxes, fines, penalties, fees for licenses or certificates of authority or of any other sum exacted for the privilege of doing business in such other state, or shall be subjected to any restrictions, obligations, conditions or penalties imposed for the privilege of doing business in such other state, and such requirements are greater than those imposed by this State for like purposes upon similar insurance companies of such other state, or their agents, then and in every such case, all such insurance companies of such other state, and the authorized agents thereof in this State, shall make like deposits in this State, and shall pay for taxes, fines, penalties,

sioner of Insurance of Rhode Island had required American Fidelity and Casualty Company, Incorporated, a Virginia corporation doing business in Rhode Island, to make an additional deposit of $90,000 in securities for the privilege of doing business in that State for the year beginning April 1, 1952.

American had been doing business in Rhode Island for some fifteen years under license renewed on April 1 of each year. On March 1, 1952, the Insurance Commissioner of Rhode Island wrote to American stating that an analysis of its annual statement for 1951 disclosed a net decrease in surplus of $969,379.41; that a Federal income tax claim was pending against it in the sum of $1,857,499.18; that securities of the company aggregating $1,970,000 had been deposited with a Richmond bank and were not to be disposed of without the consent of the Collector of Internal Revenue; and that several States had ruled that a premium tax was payable by the company in a greater amount than it had been paying. The Commissioner requested that because of these matters and of litigation pending in several States an official of the company be present at the Commissioner's office on April 1, 1952, "and stand interrogation as to why we should renew your authority to do business in this State commencing April 1, 1952." In the meantime, it was stated, renewal of the license of the company would be held· in abeyance.

The Chairman of the Board of American attended the meeting in response to this summons and was told by the Commissioner that he would not renew the company's license unless its deposit of $10,000 was increased· to

fees for licenses or certificates of authority, and for any other fee or charge for the privilege of doing business in this State, an amount in the aggregate equal to the amount of such charges and payments imposed by the laws of such other state or subdivision thereof on similar insurance companies of this State and their agents, and shall be subjected to such greater restrictions, obligations, conditions and penalties imposed by such other state or subdivision thereof upon similar insurance companies of this State and the authorized agents of such companies.

$100,000. The Company's Chairman protested this requirement as being unreasonable but was told by the Commissioner: "That is what we require or we will not renew your license." The company did not then put up the deposit and its license was not then renewed. Soon after May 15, 1952, the President of American also conferred with the Commissioner in an effort to persuade him to rescind his demand, but the Commissioner asserted that he had ample authority to make the demand, refused to change it and advised that he would issue a cease and desist order if the deposit was not made. Thereafter, on August 4, 1952, the company complied with the demand of the Commissioner and deposited with him $90,000 of United States Treasury bonds.

Some two weeks later American received a letter from the Commissioner, dated August 19, 1952, enclosing an instrument entitled "Agreement of Deposit in Trust," to be executed by American and the Commissioner, setting forth that the deposit of securities was for the benefit of the company's policyholders in Rhode Island and providing that the Commissioner should have power to require the deposit of additional securities in any amount he should see fit. The company replied that it could not see the necessity of such an agreement as it understood the Rhode Island Code gave the Commissioner the authority to require deposits. The Commissioner replied by telephone that this agreement was under a different section of the Code from the one which required the company to deposit $10,000 for the privilege of doing business in the State. When the document was not promptly returned the Commissioner called again to say that if it was not in his office within twenty-four hours he would issue an order to show cause why the company's license should not be revoked. The agreement was finally executed by American and transmitted to the Commissioner by letter of September 10, 1952, in which it was stated that it was executed with the understanding that the deposit of securities had been made

pursuant to the Commissioner's demand and not voluntarily. Thereafter the Commissioner of Insurance of Virginia, acting under § 38.1-87 of the Code, notified six Rhode Island insurance companies doing business in Virginia to increase their deposits to $100,000. All complied except Equitable and the Corporation Commission issued an order to it to show cause why its license to do business in Virginia should not be suspended or revoked because of its noncompliance. Equitable filed its demurrer and answer and after hearing the evidence the Commission entered the order from which this appeal was taken. The Commission later filed its opinion, in which it reviewed the evidence and stated its findings that the deposit by American was not made voluntarily, as claimed by Equitable, but pursuant to the demand of the Insurance Commissioner of Rhode Island, which demand was authorized by § 23 of Chapter 151 of the General Laws of Rhode Island.

Equitable contends that the Insurance Commissioner of Rhode Island had no authority under the laws of that State to require American to make the additional deposit and that hence Equitable was not required by § 38.1-87 of the Virginia Code to make a like deposit here.

The only part of the Rhode Island insurance laws pertinent to this case, it is agreed, is Chapter 151 of the General Laws, 1938, dealing with foreign insurance companies. By sections of that chapter the Insurance Commissioner (called the chief of the division of banking and insurance) is authorized to inquire into the financial condition and management of any insurance company. Every insurance company is required to report to the Commissioner annually as to the amount of its capital and the manner of its investment, the amount of its liabilities and other information. The Commissioner is empowered to conduct examinations and issue licenses to insurance agents whom he deems to possess the required qualifications, and to revoke such licenses upon proof, among other things, that the interests of the public are not properly served under such licenses.

Section 23 of Chapter 151, under which the Commissioner acted in this case, provides that the Insurance Commissioner may at any time examine into the affairs of any insurance company, may examine its books and its officers and agents, and publish the result of his investigation if he deems that advisable. Whenever it shall appear to the Commissioner from the statements of a company or from an examination of its affairs that it is insolvent, or unsound in its financial condition or business policies, or that its condition or management renders its further transaction of business hazardous to the public or its policyholders, or that the amount of its funds or contingent assets is deficient, or that its capital is impaired, or that it is conducting its business fraudulently, or refuses or neglects to comply with the laws of the State, then it is made the Commissioner's duty, after notice and hearing, to revoke the licenses issued to said company and its agents, or suspend such licenses for a period not exceeding their unexpired terms.

The Commissioner is required to cause notice of such revocation or suspension to be published in such manner as he may deem necessary for the protection of the public, and no company shall issue any insurance policy after such revocation or suspension until its license is restored by the Commissioner. The statute provides that a company aggrieved by the revocation or suspension of its license may within ten days apply to the Superior Court for review, and in event of an adverse decision may within ten days appeal to the Supreme Court, but the revocation or suspension continues in force until the final decision of the Supreme Court unless vacated by the Commissioner during the pendency of the appeal.

We agree with the Commission that these statutes give to the Insurance Commissioner of Rhode Island "broad and sweeping powers." We think, too, that like the statutes of Ohio, referred to in *State Ex Rel. National Mut. Ins. Co.* v. *Conn*, 115 Ohio St. 607, 155 N. E. 138, 50 A. L. R. 473, they are remedial statutes and are to be liberally construed to

effect the legislative purpose and intent. As said in that case: "The powers of the superintendent are necessarily limited and those limits are not to be transcended, yet in determining those limits the court should look to the object and purpose of the legislation and the mischief to be prevented, and so enlarge by implication the letter of the law as effectually to accomplish the ends to be attained. * * * .

" * * * It is not necessary to reach the conclusion that there has been a clear violation of some specific statute imposing a duty; the superintendent must be held to have some implied powers necessary to carry out the purposes stated in the express provisions of the statutes. * * * ." 50 A.L.R. at pp. 479, 481.

Section 23 of Chapter 151 not only gave the Commissioner power to revoke or suspend American's license to do business in Rhode Island, but it gave him power also to restore it after revoking or suspending it. The statute does not state under what circumstances a revoked or suspended license may be restored but as the Commission stated in its opinion, "The power to reinstate necessarily carries with it the power to impose conditions." The conditions imposed ought to be reasonable and be related to the causes found by the Commissioner for the revocation or suspension. The causes cited by the Commissioner in his letter of March 21, 1952, had to do with American's financial condition which the Commissioner interpreted as involving hazards to Rhode Island policyholders or public. The Commissioner was given the power to revoke or suspend American's license for that cause. Within the express power given him by the statute to restore that license would necessarily reside the power to require action or impose conditions which would remove the cause of the revocation or suspension. It would be a narrow and crippling construction of the statute to hold that it withheld from the Commissioner the means of exercising a power expressly given. It would amount to saying that he must act without reason because the statute does not specify what reason there must be for his act.

It appears that the Rhode Island courts have not interpreted this statute with respect to the powers of the Insurance Commissioner thereunder, but the Attorney General of Rhode Island, whose views are of course persuasive, advised the Insurance Commissioner that said § 23 gave him "broad visitorial powers," and that while he was not authorized by the statute to demand or require a deposit in addition to that required by Rhode Island's retaliatory statute (§ 22 of Ch. 150, pursuant to which American had deposited $10,000 when it began to do business in Rhode Island), yet if it appeared to the Commissioner that one of the statutory conditions for revocation existed, but could be corrected by making a deposit, the Commissioner was empowered to make an agreement with the company for such deposit.

We cannot agree with appellant's argument that the deposit was a voluntary act on the part of American or an *in terrorem* measure on the part of the Commissioner which was without sanction of law and to escape which American should have exercised its right of appeal. American's president admitted that he did not desire a court hearing involving the financial solvency of his company. A successful appeal might well have proved to be a Pyrrhic victory in view of the fact that the Commissioner's revocation would continue during the appeal and the Commissioner had the right to publish the fact of the revocation. Equitable well says in its brief that "As soon as the public gains the impression that an insurance company lacks financial integrity, that company is doomed."

Our conclusion is that the act of the Insurance Commissioner in requiring the additional deposit to be made by American was authorized by the statute law of Rhode Island[2] and that in consequence of that act § 38.1-87 of the

[2] It is shown in evidence that attempts have been made on four occasions to add to Chapter 151 of the Rhode Island laws a section specifically authorizing the Insurance Commissioner to require additional deposits. Equitable argues that this is evidence that the power is not possessed under the present law. We do not know what caused the failure of the proposals and we do not regard that fact as affecting the meaning of the present law.

Code of Virginia required that Equitable make a like deposit of securities in this State.

Section 38.1-87 of the Code of Virginia, *supra,* provides in substance, and so far as we are here concerned, that if by the laws of any other State an insurance company of this State is required to make any deposit of securities in such other State for the protection of policyholders or for any other purpose, or is subjected to any conditions or penalties for the privilege of doing business in that State, greater than those imposed by this State for like purposes upon similar insurance companies of that State, then all such insurance companies of that State shall make like deposits and be subjected to like conditions and penalties for the privilege of doing business in this State. It is a retaliatory statute, of a kind existing in many States, the general purpose of which is well stated in *State* v. *Fidelity & Casualty Ins. Co.,* 49 Ohio St. 440, 31 N. E. 658, 660, 16 L.R.A. 611, 34 Am. St. Rep. 573, as follows:

"* * * This, then, is a retaliatory statute. It treats the companies of other states as Ohio companies are treated in them; but the moment it is made to appear that Ohio companies are not treated with the same favor in another state that companies of that state are treated in Ohio, a case is made for the application of its provisions, and retaliation follows as a result. It is true that the ultimate object of the statute is to secure reciprocity; but what we have now to do with is not its ultimate, but its immediate, object, and that is to retaliate on the companies of a given state disfavors shown to Ohio companies in the same state."

Being a retaliatory statute it is to be strictly construed, executed with care and applied only to cases that clearly come within its terms. *Bankers Life Co.* v. *Richardson,* 192 Cal. 113, 218 P. 586; *State* v. *American Ins. Co.,* 79 Ind. App. 88, 137 N. E. 338; *State* v. *Fidelity & Casualty Ins. Co.,* 39 Minn. 538, 41 N. W. 108; *Life & Casualty Ins. Co.* v. *Coleman,* 233 Ky. 350, 25 S. W. (2d) 748; *Metropolitan Life Ins. Co.* v. *Boys,* 296 Ill. 166, 129 N. E. 724.

If, however, the Rhode Island law authorized the Rhode Island Insurance Commissioner to require the additional deposit, and we think it clearly does, then it is not doubtful that the Virginia retaliatory statute applies and requires that a like deposit be made by similar insurance companies of Rhode Island doing business in this State. The question is not whether the Rhode Island Commissioner was justified by the facts in requiring the additional deposit, but whether he was authorized by the laws of Rhode Island to make the requirement. The requirement was made "by the laws" of Rhode Island if the Commissioner acted pursuant to Rhode Island laws which authorized his action. It is not necessary that such authority be found in the express terms of the statute. It is sufficient if it resides by necessary implication in the authority given by express terms.

Equitable contends also that retaliatory action was not authorized against it in this case by § 38.1-87 because Equitable and American are not "similar insurance companies," and the additional deposit was not "for like purposes," as referred to in that statute. The evidence shows that Equitable is licensed in Virginia to write every kind of insurance that American is licensed to write and some other types as well, and the Commission properly held that they were similar companies as that term is used in the statute. The test of similarity under the Virginia statute is in the kind of insurance business the companies engage in, not in their financial structure or condition as Equitable contends. See 80 C.J.S., pp. 1302-5; Annotation, 17 A.L.R. 94. If the insurance companies are similar and any other State imposes a greater burden on Virginia companies "for the protection of policyholders or for any other purpose," *i.e.*, for any purpose, then the retaliatory provision of § 38.1-87 becomes applicable.

The order of the Commission is

*Affirmed.*